**MCCORRISTON MILLER MUKAI MACKINNON LLP**

DAVID J. MINKIN        3639-0
BRETT R. TOBIN         9490-0
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawaiʻi 96813
Telephone No: (808) 529-7300
Facsimile No.: (808) 524-8293
E-mail:    djminkin@m4law.com; btobin@m4law.com

**ARNOLD & PORTER KAYE SCHOLER LLP**

ALLON KEDEM *(admitted pro hac vice)*
JEFFREY L. HANDWERKER *(admitted pro hac vice)*
CARMELA ROMEO *(admitted pro hac vice)*
MICHAEL MAZZULLO *(admitted pro hac vice)*
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
E-mail:     allon.kedem@arnoldporter.com;
            jeffrey.handwerker@arnoldporter.com
            carmela.romeo@arnoldporter.com
            michael.mazzullo@arnoldporter.com

Attorneys for Plaintiff
ASTRAZENECA PHARMACEUTICALS LP

*Caption continued on next page*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP,<br><br>      Plaintiff,<br><br>vs.<br><br>ANNE E. LOPEZ, in her official capacity as the ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br>      Defendant. | CASE NO. 1:25-CV-00369-MWJS-WRP<br><br>**PLAINTIFF ASTRAZENECA PHARMACEUTICALS LP's SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**; DECLARATION OF CARMELA T. ROMEO; EXHIBITS "1"-"7"; CERTIFICATE OF SERVICE |

**PLAINTIFF ASTRAZENECA PHARMACEUTICALS LP's BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

      Plaintiff ASTRAZENECA PHARMACEUTICALS LP, by and through its undersigned counsel at McCorriston Miller Mukai MacKinnon LLP, hereby respectfully submits the following as its Supplemental Brief in Support of its Motion for a Preliminary Injunction.

1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

   I.    Discovery Confirms AstraZeneca Is Likely to Succeed on the Merits ...........3

   II.   Discovery Confirms Act 143 Imposes Costly Burdens on AstraZeneca ......14

CONCLUSION .....................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*AbbVie Inc. v. Drummond*, No. CIV-25-1156-PRW, --- F. Supp. 3d---,
  2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) ................................................... 1

*AbbVie, Inc. v. Fitch*,
  152 F.4th 635 (5th Cir. 2025) .............................................................................. 1

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) ........................................................................................... 15

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ................................................................................... 2, 3, 15

*Livadas v. Bradshaw*,
  512 U.S. 107 (1994) ............................................................................................ 3

*NIH v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025) ...................................................................................... 15

*PhRMA v. McClain*,
  95 F.4th 1136 (8th Cir. 2024) ............................................................................. 1

*PhRMA v. Morrisey*,
  760 F. Supp. 3d 439 (S.D.W. Va. 2024) ....................................................... 1, 14

# INTRODUCTION

Lawsuits challenging state contract pharmacy laws reflect a clear pattern. Courts that have been presented with a developed factual record detailing the actual operation and effect of those state laws, and that have taken seriously the laws' real-world consequences—especially "the implications of the replenishment model"—have invalidated them as preempted by federal law. *See, e.g.*, *AbbVie Inc. v. Drummond*, No. CIV-25-1156-PRW, --- F. Supp. 3d ----, 2025 WL 3048929, at *6 (W.D. Okla. Oct. 31, 2025); *see, e.g.*, *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 455-56 (S.D.W. Va. 2024). By contrast, courts that have *lacked* a full factual record, or have failed meaningfully to engage with how state contract pharmacy laws actually function, have permitted the laws to stand. *See, e.g.*, *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024); *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025).

As AstraZeneca's preliminary injunction motion explained (at 22), it "intend[ed] to seek expedited discovery to address the fact issues overlooked in" cases like *McClain* and *Fitch* by presenting the Court with a "develop[ed] factual record" upon which to evaluate its claims. AstraZeneca now has that record. In three months of expedited third-party discovery, AstraZeneca has conducted two depositions of covered entity corporate representatives, has obtained a detailed declaration from a hospital administrator at a third covered entity, and has obtained over 1,000 pages of documents from four different 340B program participants.

The undisputed evidence makes two propositions crystal clear: (1) Act 143 regulates price, not delivery; and (2) regardless, the Act's practical "effect" is to engraft costly new state-law obligations onto AstraZeneca's participation in the federal 340B program. The result is a burdensome state-law scheme that "skew[s]" the "delicate balance of statutory objectives" underlying the federal program. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348, 350 (2001). And that scheme irreparably harms AstraZeneca. The motion for preliminary injunction should thus be granted.

## ARGUMENT

The preliminary injunction record confirms that Act 143 conflicts with the federal 340B program and with the federal patent laws and inflicts irreparable harm on AstraZeneca. Specifically, evidence obtained in discovery shows how covered entities in Hawaii leverage a business model known as the "replenishment model" to generate 340B discounts for drugs sold through for-profit pharmacies like Walgreens and CVS. Drugs are purchased at steep 340B discounts and then resold at full commercial prices, thereby maximizing profits for covered entities and their contract pharmacy partners—but at the expense of manufacturers like AstraZeneca.

As discovery further shows, Act 143 requires AstraZeneca to facilitate these discounts in unlimited amounts, even though Section 340B itself permits AstraZeneca to limit them under federal law. And the Act requires AstraZeneca to offer these discounts solely *because* it participates in the federal 340B program. But

2

even if the obligations imposed by Act 143 could somehow be characterized as a delivery requirement—contrary to the law's actual operation and effect—that would not matter: Regardless, the evidence demonstrates that the new obligations imposed by the Act are significant and costly to manufacturers like AstraZeneca.

Act 143's practical effect is thus to drastically expand manufacturers' obligations if—but *only* if—they choose to participate in the federal 340B program, "exert[ing] an extraneous pull on the scheme established by Congress." *Buckman*, 531 U.S. at 353. The Act "is therefore pre-empted by [the federal] scheme." *Id.*

I. **Discovery Confirms AstraZeneca Is Likely to Succeed on the Merits**

The undisputed record establishes that the "real effect" of Act 143 is to restrict the *price* at which AstraZeneca's drugs must be offered. *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994). The Act requires AstraZeneca, under state law, to offer unlimited 340B discounts for a category of transactions—contract pharmacy sales—that AstraZeneca would otherwise be permitted to limit under federal law.

**The Replenishment Model**. Covered entities and contract pharmacies in Hawaii facilitate contract pharmacy sales using the so-called "replenishment model." Under this model, contract pharmacies dispense prescription drugs to their customers at commercial prices from the pharmacy's "neutral" (*i.e.*, general and undifferentiated) inventory, where "340B-priced drugs" are mixed together "with drugs purchased at commercial or contracted prices." Ex. 2, HPH Decl. ¶¶ 9, 22, 25.

3

The pharmacies then enlist third-party entities, ███████████████

████████████████████████████████████████████

███████████████████████████. Ex. 3, HHSC Dep. 59:17-25. ███████

████████████████████████████████████████████

████████████████████████████████████████

████████████ *Id*. These replacement sales are placed with wholesalers at 340B-discounted prices, and the units are shipped directly to the pharmacy, which takes title to the drugs and deposits them in its general inventory—from which "the drug can be distributed to any pharmacy customer." Ex. 2, HPH Decl. ¶ 22. The cycle then begins anew, with the pharmacy again using its replenished inventory to sell drugs to any customer who walks in the door, whether 340B-eligible or not. *Id*. ¶ 16.

    The replenishment model makes unmistakably clear that the *delivery* (*i.e.*, movement) of 340B-discounted drugs from the manufacturer to the wholesaler to the pharmacy is no different than that of any other drug. Instead, the only difference between a 340B sale and a regular commercial sale is the *price* at which the manufacturer must offer to replace the already-dispensed drug. The discovery record is uncontested on this point. Indeed, *nine* features of the replenishment model show that Act 143 operates to generate pricing discounts, while changing nothing about how pharmaceutical products are actually delivered in the physical world.

*First*, price is the only thing that distinguishes 340B drugs from non-340B drugs. As Hawaiʻi Pacific Health's System Director of Pharmacy put it in her declaration, "there is no difference between AstraZeneca products that are offered under the 340B program and AstraZeneca products not offered under the 340B program, other than the price at which they are offered." Ex. 2, HPH Decl. ¶ 25. The other covered entity representatives who provided deposition testimony in this case uniformly agreed. Ex. 3, HHSC Dep. 42:21-25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 4, Queen's Dep. 69:4-9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

Products sold through the 340B program are also identical to those sold at commercial prices in terms of the physical content of the products, their packaging, labeling, and National Drug Code. Ex. 2, HPH Decl. ¶ 25. Indeed, the statutory term "340B drug" is itself merely a pricing term—meaning a drug offered at the discount specified by Section 340B, *see* Act 143 § 2—and is not an intelligible concept apart from describing the price at which drugs are offered.

*Second*, the role of a manufacturer like AstraZeneca in the 340B replenishment process differs from its role in a regular commercial sale *only* in terms of the price at which it offers its products. Manufacturers generally do not distribute their products directly, but instead make their products available through

5

wholesalers, which handle distribution of the products to downstream customers such as pharmacies. Ex. 2, HPH Decl. ¶ 23. The *price* offered through wholesalers may differ depending on 340B status. For regular commercial sales, AstraZeneca offers its products at ███████████████████████████████████ ████████████████████████████████. Ex. 3, HHSC Dep. 30:19-31:1. For 340B sales, AstraZeneca offers its products at ████████████████. *Id.*

Besides the prices at which the products are offered, however, ████████ ██████████████████████████ *Id.* And other than pricing, the process of placing orders for AstraZeneca's products via a wholesaler is also the same. For instance, when asked whether ███████████████████████████████████ ████████████████████████████████████," Hawai'i Health Systems Corporation's Chief Administrative Officer answered simply: "██." *Id.* 30:19-23.

**Third**, irrespective of Act 143, AstraZeneca's products *always* remain available for purchase and delivery to any location—provided the purchasing entity is willing to pay commercial prices. Under its policy, AstraZeneca offers 340B discounts for sales at designated contract pharmacies only. But for pharmacies that are *not* designated under AstraZeneca's policy, a sale of the same drugs for delivery to the same pharmacy location could still be placed at a commercial, non-340B price:

██████████████████████████████████████████████████
████████████████████████████████████████████
████████████

6

[REDACTED]

Ex. 4, Queen's Dep. 114:6-13; *see id.* 113:23-114:24; Ex. 2, HPH Decl. ¶ 28. Covered entities and pharmacies are thus always able to order delivery of AstraZeneca's products, provided they are willing to pay commercial prices.

Equally important, there is no evidence that a customer has *ever* failed to [REDACTED] Ex. 4, Queen's Dep. 115:2-4; *see* Ex. 2, HPH Decl. ¶ 27 ("I am unaware of any situation where HPH has placed an order at 340B prices but the drugs were not delivered to their intended contract pharmacy destination."); *see also* Ex. 4, Queen's Dep. 114:23-115:11; Ex. 3, HHSC Dep. 65:7-16. Instead, "under AstraZeneca's policy," a covered entity is simply "unable to place orders for AstraZeneca's drugs at 340B prices for shipment to non-designated contract pharmacies." Ex. 2, HPH Decl. ¶ 27.

Thus, with or without Act 143, AstraZeneca's drugs remain available for delivery in any amount to any location without limit—provided that the purchase is made at commercial prices. It is only if the covered entity seeks to obtain drugs "at 340B prices" that the entity may be "unable to place orders for AstraZeneca's drugs." *Id.* In other words, whether AstraZeneca's products will be *delivered* is not at issue; the only question is the *price* at which the drugs will be *offered* for sale.

***Fourth***, wholesalers and contract pharmacies do not handle the physical movement of 340B-discounted drugs any differently than they handle drugs

7

purchased at commercial prices. In both cases, the drugs are shipped directly from the wholesaler to the contract pharmacy, where they are placed in the pharmacy's general ("neutral") inventory. Ex. 2, HPH Decl. ¶¶ 9, 25. From there, the drug may be distributed to *any* pharmacy customer, whether 340B-eligible or not. *Id.* ¶ 16. There is "no difference" between the movement of 340B and non-340B priced drugs; the only distinction is "the price at which [the drugs] are offered." *Id.* ¶¶ 16, 25.

*Fifth*, there is no practical difference to covered entities between a 340B sale and a non-340B sale at a contract pharmacy, other than the price at which the product can be replaced—and hence the corresponding revenue it generates for the covered entity. 340B sales are generally placed on behalf of covered entities by third-party administrators, who manage contract pharmacy sales from end-to-end. *Id.* ¶ 22. ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅ Ex. 3, HHSC Dep. 38:6-9, nor do covered entities "review, approve, or direct individual replenishment orders at the time they are placed," Ex. 2, HPH Decl. ¶ 21. Indeed, covered entities are not directly involved in the physical distribution of 340B drugs to the contract pharmacy at all. *Id.* ¶¶ 9, 21, 22, 24; Ex. 3, HHSC Dep. 38:6-39:17; *see id.* 39:15-17 (▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅).

Instead, contract pharmacy orders are significant to covered entities ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. Ex. 4,

8

Queen's Dep. 87:8-14; Ex. 2, HPH Decl. ¶ 14. Covered entities take a percentage of the arbitrage revenue generated by "the difference" between "the 340B price" (*i.e.*, what the covered entity pays) and the commercial price (*i.e.*, what "the patient and his or her insurer together pay"). Ex. 2, HPH Decl. ¶ 14. That price difference—rather than anything about the physical movement or delivery of the drugs—is what "generates savings" for the covered entity. *Id.*

**Sixth**, price is also the only difference between a 340B sale and non-340B sale from the perspective of a contract pharmacy. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Ex. 3, HHSC Dep. 42:1-25. Once the pharmacy takes possession of the products, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *Id.* 42:21-23 (▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬).

From there, the drugs are dispensed to retail customers at commercial prices *without* regard to a customer's potential 340B eligibility. A customer's eligibility is determined, usually by the third-party administrator, only "after the drugs have already been dispensed" to the pharmacy's customers. Ex. 2, HPH Decl. ¶ 16; *see* Ex. 3, HHSC Dep. 41:7-25. The pharmacy's role in acquiring and dispensing 340B drugs and non-340B drugs is thus the same from start to finish—except that the pharmacy receives a cut of the arbitrage revenue that 340B sales generate based on

9

their discounted price. Ex. 2, HPH Decl. ¶¶ 16, 19.

*Seventh*, patients (whom Act 143 does not address) also typically experience no difference between 340B and non-340B sales at contract pharmacies. "Under the replenishment model, the covered entities and the contract pharmacies determine patient eligibility for 340B drugs after the drugs have already been dispensed to patients, rather than using prior authorization protocols under which a patient's eligibility is determined at the point of sale." *Id.* ¶ 16. As a result, by the time 340B eligibility is determined, the patient has already purchased and received the product, paying any copay set by the patient's insurer, with the remainder reimbursed by the insurer itself at the commercial price. *Id*. ¶¶ 12-14; Ex. 3, HHSC Dep. 56:5-24.

Thus, the price that a patient pays at a contract pharmacy for 340B drugs is usually the same commercial price, regardless of the price at which the drug is later replenished. Ex. 2, HPH Decl. ¶ 13 ("the patient generally pays the copay set by the patient's insurer, and the insurer pays a previously agreed upon contracted rate, regardless of whether the dispensed drug had been acquired by the pharmacy at the 340B price"); Ex. 3, HHSC Dep. 56:5-12 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████).

In fact, *no* covered entity that has produced evidence in this litigation ████████████████████████████████████████████████████████████████████████████. *Id.*

10

55:13-24. To the contrary, the covered entity representatives uniformly testified that

they pass ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

*Id.*; Ex. 2, HPH Decl. ¶¶ 29-30; Ex. 4, Queen's Dep. 92:8-10 ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Therefore, patient access is simply not an issue under Act 143: ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 3, HHSC Dep. 65:13-16 (Q: ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

***Eighth***, contract pharmacies are typically independent contractors, not agents,

of covered entities. The contract pharmacy agreements produced in this case are

clear and consistent that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 2, HPH Decl. ¶ 10; Ex. 5 (HPH), Sect.

26; Ex. 6 (HHSC), Sect. 8.9; Ex. 7 (Queen's), Sect. 7. They also at times expressly

disclaim ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex.

5 (HPH), Sect. 26; *see, e.g.*, Ex. 6 (HHSC), Sect. 8.9; Ex. 7 (Queen's), Sect. 7.

All the covered entities have also agreed that drugs purchased at 340B prices for

their contract pharmacy sales come into *the pharmacy's* sole possession and control:

11

The drugs are "delivered directly to the contract pharmacy," which takes full "possession of," responsibility for, and control over "340B-priced drugs." Ex. 2, HPH Decl. ¶ 9. The pharmacy then deposits the drugs into the pharmacy's "neutral" inventory, where they are handled the same as "drugs purchased at commercial or contracted prices." *Id.*; *see* Ex. 3, HHSC Dep. 38:23-39:5 ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████ ); *id.* 38:12-39:17; Ex. 4, Queen's Dep. 66:13-67:4.

These facts make unmistakably clear that contract pharmacy sales are *not* a mechanism for covered entities to "deliver" medications to disadvantaged patients through pharmacies that merely facilitate delivery on the covered entities' behalf. Instead, contract pharmacy sales are a purely *financial* maneuver: a means of nominally attributing a sale to a covered entity for purposes of accessing discounted pricing—in order to generate arbitrage revenue from 340B discounts in circumstances where federal law does not require them—while in reality changing nothing about the actual movement, handling, and dispensing of the drugs.

***Ninth***, covered entities' agreements with contract pharmacies often contain ████████████████████████████████ Ex. 4, Queen's Dep. 107:9-12. Under these provisions, the sale of a product ████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████. *See, e.g.*, Ex. 6 (HHSC), Fee Schedule ¶ 1,

HHSC0000015; Ex. 7 (Queen's), Dispensing Fee ¶ 1, QMC000686.

Thus, under Act 143, covered entities may unilaterally determine the price at which AstraZeneca must fulfill an order for a particular drug (340B versus commercial) based on the *profit* that the covered entity will turn on that order, as determined *after* the product has been sold. The order will otherwise be fulfilled the same way in all other respects. Or put differently, the resale price—and the potential profits to be generated from the resale—determines whether a covered entity places a 340B order in the first place.

***In sum***, all this evidence confirms the same unmistakable—and dispositive—conclusion: Act 143's sole operation and effect is to set the *price* at which manufacturers must offer their products. Or as one district court put it, summing up the implications of the replenishment model:

> Because the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about delivery of the drug. The question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one. Put another way, the system is about delivery *at a given price,* not delivery *per se.*

*Morrisey*, 760 F. Supp. 3d at 455. Act 143 regulates the price at which drugs must be offered for unlimited contract pharmacy sales, and accordingly the Act conflicts with federal law for the reasons explained in AstraZeneca's prior briefs.

13

## II.     Discovery Confirms Act 143 Imposes Costly Burdens on AstraZeneca

*Regardless* of whether Act 143 is construed as a regulation of price or delivery, moreover, the undisputed discovery record shows that the Act imposes significant new burdens on AstraZeneca. A declaration attached to AstraZeneca's preliminary injunction motion estimated that Act 143 imposes roughly $36,000 to $48,000 in monthly losses on AstraZeneca, based on discounts that AstraZeneca *must* offer under the Act but otherwise *would not* have to offer under federal law. Mancill Decl. ¶ 27, ECF No. 21-2. The discovery record confirms that estimate: An internal analysis produced to the State by AstraZeneca corroborates that AstraZeneca's current losses in Hawaii would amount to approximately $36,000 to $48,000 per month under Act 143. Ex. 1, Impact Spreadsheet. That evidence is unrebutted.

This undisputed evidence of harm shows that however Act 143 is construed, it imposes costly burdens on manufacturers—and imposes such burdens *solely* because of a manufacturer's participation in the federal 340B program. Those costs have two implications for this case.

*First*, Act 143 makes it substantially more expensive for manufacturers to participate in the federal 340B program, thereby "skew[ing]" the "delicate balance of statutory objectives" underlying the federal program. *Buckman*, 531 U.S. at 348, 350. The Act's interference with federal interests is particularly clear because it regulates transactions occurring within a program enacted under Congress's

14

Spending Clause authority. Where state law directly targets a Spending Clause program, the "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption," because such a program implicates a uniquely federal interest in the "obligations to and rights of the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988) (cleaned up). Here, Hawaii is impermissibly adding costs under *state* law to a manufacturer's decision to participate in the exclusively *federal* 340B program.

***Second***, the costs imposed by Act 143 amount to irreparable harm. AstraZeneca will absorb substantial losses under the Act that "cannot be recouped," and "are thus irrevocably expended." *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (cleaned up). Such costs, by definition, constitute irreparable harm.

## CONCLUSION

The Court should grant AstraZeneca's motion for a preliminary injunction.

DATED: Honolulu, Hawai'i, January 12, 2026.

/s/ Brett R. Tobin
DAVID J. MINKIN
BRETT R. TOBIN
ALLON KEDEM
JEFFERY L. HANDWERKER
CARMELA T. ROMEO
MICHAEL MAZZULLO
Attorneys for Plaintiff
ASTRAZENECA PHARMACEUTICALS LP