# EXHIBIT 2

Scott Prange, HI State Bar No. 010118
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Tel: (206) 622-3150
Email: scottprange@dwt.com

Attorneys for Non-Party
HAWAI'I PACIFIC HEALTH

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| ASTRAZENECA PHARMACEUTICALS LP, | Case No. 1:25-cv-00369-MWJS-WRP |
|---|---|
| Plaintiff, | **DECLARATION OF JENNIFER DACUMOS (HAWAI'I PACIFIC HEALTH)** |
| v. | |
| ANNIE E. LOPEZ, in her official capacity as the ATTORNEY GENERAL FOR THE STATE OF HAWAI'I, | |
| Defendant. | |

I, Jennifer Dacumos, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am a resident of the State of Hawai'i. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief. If called as a witness, I am able to testify regarding the matters below.

2. I am employed by Hawai'i Pacific Health ("HPH") and have worked as HPH's System Director of Pharmacy since 2018. I earned my Doctor of Pharmacy degree from the University of California, San Francisco in 2006.

3. In my role as HPH System Director of Pharmacy, I oversee the pharmacy functions across HPH and its facilities. This includes the administration of the federal 340B pricing program, including overseeing contractual relationships with outpatient pharmacies and specialty pharmacies (the latter of which are pharmacies focusing on pharmaceuticals for complex medical conditions needed by HPH's patients).

4. HPH operates five covered entities under the federal 340B program. *See* 42 U.S.C. § 256b (the "340B Statute"). These covered entities are Kapiʻolani Medical Center for Women & Children, Kapiʻolani Medical Center for Women & Children Hemophilia and Thrombosis Treatment Center of Hawaii, Straub Benioff Medical Center, Pali Momi Medical Center, and Wilcox Medical Center. The Kapiʻolani entities, Straub Benioff, and Pali Momi are located on Oahu, while Wilcox is located on Kauai. The four hospitals and one hemophilia center are collectively referred to in this declaration as the "HPH Covered Entities."

5. The HPH Covered Entities purchase drugs at 340B-discounted prices pursuant to the federal 340B program.

6. The HPH Covered Entities maintain multiple contract pharmacy arrangements pursuant to which they distribute drugs purchased at 340B-discounted prices.

7. The HPH Covered Entities' contract pharmacy arrangements include agreements with large, for-profit retail pharmacy chains, as well as other commercial pharmacies.

8. Some of the contract pharmacies for the HPH Covered Entities are located at physical locations that are separate from HPH's facilities, and some contract pharmacies are located outside the State of Hawaiʻi. The contract pharmacies that are located outside Hawaiʻi ship prescribed specialty pharmaceuticals to HPH patients.

9. In circumstances where the HPH Covered Entities utilize a contract pharmacy to dispense 340B-priced drugs for HPH patients, the 340B-priced drugs are delivered directly to the contract pharmacy and placed into its "neutral" inventory along with drugs purchased at commercial or contracted prices, without the HPH Covered Entities taking physical possession of the 340B-priced product.

10.     The contract pharmacies and HPH Covered Entities state in their agreements that the contract pharmacies are independent contractors, though the contract pharmacies are required to comply with the HPH Covered Entities' 340B policies and procedures, as well as all applicable laws, with respect to the distribution of 340B-priced drugs.

11.     Under the HPH Covered Entities' agreements with the contract pharmacies, the HPH Covered Entities pay the pharmacy a dispensing fee for each sale of 340B-priced drugs that the pharmacy makes under its contract pharmacy agreement. The specific dispensing fees are confidential and vary based on the type of drug and days' supply being dispensed.

12.     I believe the experience of an insured patient purchasing medicine from a pharmacy that contracts with an HPH Covered Entity is the same, regardless of whether the patient is dispensed a drug purchased at the 340B price or a drug purchased at the fully applicable contracted rate without the 340B discount.

13.     I believe that when an Eligible Patient, as defined by the 340B Statute, receives medications dispensed by a pharmacy that contracts with an HPH Covered Entity, the patient generally pays the copay set by the patient's insurer, and the insurer pays a previously agreed upon contracted rate, regardless of whether the dispensed drug had been acquired by the pharmacy at the 340B price.

14.     I believe that when an Eligible Patient, as defined by the 340B Statute, receives medications dispensed by a pharmacy that contracts with an HPH Covered Entity, the patient and his or her insurer together pay the contracted rate, and the difference between the contracted rate paid for the medication and the 340B price at which it was purchased generates savings; pursuant to the terms of the contract pharmacy agreements, the contract pharmacy deducts and retains the dispensing fee and the third-party administrator fee from the insurer's payment, and the remaining balance is remitted to the HPH Covered Entity. HPH uses the term "340B savings" to refer to the savings generated by the remaining balance that the contract pharmacy remits to the HPH Covered Entity. HPH anticipates an increase in 340B savings as a result of Act 143.

15.     The 340B Statute does not require HPH to pass on 340B discounts directly to its patients. HPH utilizes its 340B savings to provide funding for HPH's Community Benefit

DECLARATION OF JENNIFER DACUMOS (HAWAIʻI PACIFIC HEALTH)

Programs, which well exceed HPH's 340B savings. HPH's Community Benefit Programs support medical careers training, housing stability, food insecurity, and emergency bridge loans for low income working households.

16. The HPH Covered Entities and contract pharmacies purchase 340B-priced drugs in a method commonly known as the "replenishment model." Under the replenishment model, the covered entities and contract pharmacies determine patient eligibility for 340B drugs after the drugs have already been dispensed to patients, rather than by using prior authorization protocols under which a patient's eligibility is determined at the point of sale.

17. Under the replenishment model, the HPH Covered Entities may utilize a third-party entity (often referred to as a "third-party administrator" or "TPA") to assist with determining and identifying eligible patients. Under their agreements with contract pharmacies, the TPAs determine 340B Eligible Patient status based on applicable law and the 340B policies and procedures set by the HPH Covered Entities.

18. The HPH Covered Entities utilize two TPAs to manage data collection, patient-eligibility determinations, and replenishment activities associated with their contract pharmacy arrangements.

19. Under the HPH Covered Entities' arrangements with contract pharmacies, TPAs routinely determine whether dispensed prescriptions are eligible for replenishment at the 340B price after the drug has already been dispensed to the patient.

20. Replenishment orders are generally generated and placed by TPAs based on data analysis. While HPH personnel do not review each individual replenishment transaction, HPH personnel do approve the ultimate purchases of replenishment drugs by authorizing invoices submitted by a wholesaler of the drug.

21. HPH does not routinely review, approve, or direct individual replenishment orders at the time they are placed, though HPH does review reports on the distribution of 340B drugs to Eligible Patients provided by the contract pharmacies and TPAs. HPH additionally conducts self-audits of 340B dispensing activity as well as contract pharmacy drug purchases to monitor 340B program compliance.

22. Under the replenishment model, I believe that once the TPA has identified 340B-eligible sales equivalent to one package size, it places an order for a package of that drug on behalf of the covered entity, thereby "replenishing" the drug that has already been dispensed with a 340B-priced drug. That replenishment order is then shipped directly to the contract pharmacy, which puts it in the pharmacy's general inventory (also known as "neutral" inventory), where the drug can be distributed to any pharmacy customer.

23. The HPH Covered Entities purchase AstraZeneca's 340B-discounted drugs by asking a wholesaler to purchase the AstraZeneca product at the 340B price.

24. The HPH Covered Entities usually set up a "ship to bill to" arrangement with the wholesaler, directing the 340B-discounted drugs that are purchased (and billed) to the HPH Covered Entities to be delivered to a contract pharmacy.

25. I believe there is no difference between AstraZeneca products that are offered under the 340B program and AstraZeneca products not offered under the 340B program, other than the price at which they are offered. I believe the AstraZeneca products sold through the 340B program are identical to the same AstraZeneca products sold at commercial or contracted prices in terms of the physical content of the products, their packaging, labeling, and National Drug Code (NDC).

26. I believe that AstraZeneca's policy does not prevent HPH from receiving or acquiring products manufactured by AstraZeneca at contracted prices.

27. I believe that under AstraZeneca's policy, the HPH Covered Entities are unable to place orders for AstraZeneca's drugs at 340B prices for shipment to non-designated contract pharmacies. As a result of that inability to place orders, I am unaware of any situation where HPH has placed an order at 340B prices but the drugs were not delivered to their intended contract pharmacy destination.

28. I believe non-designated contract pharmacies may acquire drugs that otherwise would be 340B-eligible drugs if shipped to the HPH Covered Entities or to HPH's designated contract pharmacies, but HPH and the HPH Covered Entities do not receive 340B savings from such acquisition and sale.

29. The HPH Covered Entities do not require contract pharmacies to offer discounted pricing to patients at the point of sale based on whether a drug was ultimately replenished at the 340B price.

30. The HPH Covered Entities do not operate a program under which 340B discounts are automatically passed through to patients at contract pharmacies at the time prescriptions are filled.

31. Any patient financial-assistance programs that HPH or the HPH Covered Entities may operate are separate from the mechanics of contract pharmacy dispensing and are not tied to whether a particular drug was purchased at the 340B price.

32. 340B savings generated through the HPH Covered Entities' contract pharmacy arrangements are generally aggregated and used at HPH's discretion. That includes utilizing 340B savings to provide funding for HPH's Community Benefit Programs.

33. Under the 340B program, HPH and the HPH Covered Entities are prohibited from taking duplicate discounts or rebates; nor are they permitted to divert (*i.e.*, to sell or transfer in a manner inconsistent with Section 340B) drugs that were acquired at 340B prices to anyone other than a "patient of the entity."

34. The foregoing, along with the declaration I submitted in support of the State of Hawaii's Opposition to AstraZeneca's Motion for Preliminary Injunction, *see* Dkt. 43-2, describe HPH's and the HPH Covered Entities' standard practices with respect to their contract pharmacy arrangements and 340B operations and is not limited to isolated or atypical transactions.

Executed on January 8, 2026, at Honolulu, Hawai'i.

*Jennifer Dacumos*
Jennifer Dacumos